UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| SHEREE SHEPHERD, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. C-10-313 |
| | § | |
| GOODWILL INDUSTRIES OF SOUTH TEXAS, INC., | § | |
| | § | |
| | § | |
| Defendant. | § | |

# ORDER

Pending before the Court is the Defendant Goodwill Industries of South Texas Inc.'s Motion for Summary Judgment. (D.E. 18.) For the reasons stated herein, the motion is DENIED.

**I.       Jurisdiction**

The court has federal question jurisdiction over the plaintiff's case pursuant to U.S.C. § 1331 because plaintiff brings claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"); and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(b)(5)(A).

**II.      Background**

Plaintiff Sheree Shepherd is a Black female who is certified as a blind individual. Her claims in this action are based upon the decision of Defendant Goodwill Industries of South Texas, Inc. ("Goodwill") not to hire her, which Plaintiff alleges was based on unlawful discrimination due to her race and disability and based on retaliation for a prior charge of discrimination that she filed against one of Goodwill's employees. (D.E. 1, D.E. 19.)

The summary judgment evidence establishes as follows:

Starting in early 2006, Plaintiff was employed at South Texas Lighthouse for the Blind ("STLB") as an editor of military publications based on the Corpus Christi Naval Air Station. She was terminated from this position 23 days later on February 23, 2006.  According to Plaintiff, her termination was the culmination of a period of harassment and discrimination at the hands of her supervisors, Olga Benavides, the Publishing Program Manager at STLB, and Rose Ann Johnson, who was the Senior Editor at the STLB when Plaintiff worked there, and who is now employed by Defendant Goodwill.  (D.E. 19, Ex. 1 (Shepherd Affidavit) at 4.)

Plaintiff contends that, on the day of her termination, Ms. Johnson became "so enraged with [her] that [Plaintiff] became ill." (Id.)  She became "so sick and stressed that [she] passed out in front of [Ms. Johnson.]"  Id.  When she regained consciousness, Ms. Johnson told her to go home.  When Ms. Shepherd got to her car, the base medics arrived and asked if she was okay.  Id.  "[S]uddenly the base military police arrived and [she] found herself surrounded by military police with their guns drawn."  Id.  They ordered her to put up her hands, telling her that Ms. Johnson had reported that she had "made a terrorist threat."  Id.  They then told her that Ms. Johnson had fired her and scraped off the clearance decals from her car.  Id.

Based on these events, on June 23, 2006, Plaintiff filed an EEOC charge against Ms. Johnson, as well as against her other supervisor, Ms. Benavides, for harassment and discrimination on the basis of race and/or disability. (D.E. 19, Ex. 1 (Shepherd Affidavit) at 3-5.)

A little over a year later, around August 6, 2007, Plaintiff received an email regarding the position of Junior Editor for Defendant Goodwill.  The job was also based at the Naval Air Station in Corpus Christi and also involved editing military publications.  Pursuant to its Federal Contract, the Goodwill was obligated to hire someone with a disability for this job, and the job

posting made clear that applicants must have a documented disability in order to apply. (D.E. 18, Ex. 7 (job posting) at 1.)[1]

On August 10, 2007, Plaintiff applied for the position in person at the Goodwill's administrative officers and was received by Nora Garza, an intake specialist in Goodwill's Workforce Training division. (D.E. 18, Ex. 2 (Garza statement) at 1.) Plaintiff filled out an application, but Garza noted that Plaintiff did not answer the required question of whether she had ever been terminated from an employment position. (Id.)

Garza asked about the missing information. But Plaintiff refused to discuss it and wrote on her application: "Unable to disclose per legal agreement." (D.E. 18, Ex. 3 (application) at 3.) Plaintiff also did not indicate the dates of her prior employment as an editor for the military at the STLB or her "Reason(s) for Leaving" that position. (D.E. 18, Ex. 3 (Plaintiff's application) at 2.) According to Ms. Garza, Plaintiff "said something about probably not being able to be hired again 'out there' (at CCAD [Corpus Christi Army Depot])," but she did not explain further. (D.E. 18, Ex. 2 (Garza statement) at 1.)

After Plaintiff submitted her application, Ms. Garza thanked her and scheduled Plaintiff to come in on the following Monday, August 13, 2007, to complete the next stage in the application process. The next stage consisted primarily of an editing exercise on four pages of text, which all applicants were required to complete in order to be considered for an interview. (Id. at 2.)

When Plaintiff arrived the following Monday, Ms. Garza set up the editing exercise on the computer. Plaintiff stated that she was having problems seeing the text. (Id.) Upon realizing that the computer was not equipped with the adaptive visual technology to which she was

---

[1] In fact, according to Plaintiff, the Junior Editor job with the Goodwill was the same job Plaintiff had performed at STLB. Goodwill had assumed the contract with the military that was previously held with STLB. (D.E. 19, Ex. A (Shepherd Affidavit) at 5-6.)

accustomed, she asked whether Goodwill had a computer designated for either "Zoom Text" or "JAWS," which it did not. (D.E. 18, Ex. 10 (Shepherd Depo.) at 228; D.E. 19, Ex. 1 (Shepherd Affidavit) at 6.) She then asked whether there was "any way that [she could] utilize the accommodation on the computer that is built into the Microsoft system" (that is, the Microsoft default font enlarger), or "what they had at that time." (D.E. 18, Ex. 10 (Shepherd Depo.) at 228.) Using the Microsoft technology, the Director of Information Technology was able to magnify the text and adjust the screen for Plaintiff within 5 to 15 minutes. (Id. at 228-231; D.E. 18, Ex. 2 (Garza statement) at 2.)

Once Plaintiff began the exercise, Ms. Garza left the room. (D.E. 18, Ex. 2 (Garza statement) at 2.) Plaintiff completed the exercise but, according to Ms. Garza:

> she took a very long time to complete it. I came in to check on her at least once, and possibly two times, because I expected her to be finished. She took about one hour and forty-five minutes to complete the test, compared to other applicants who completed it in well under an hour.

(Id.) Ms. Garza states that Plaintiff "did not say she was having any problems or ask any questions." (Id.) Plaintiff "was calm and friendly" and gave Ms. Garza "no problems … at all." However, Ms. Garza states: "I did think she was very slow in completing the test." (Id.)

About a week after Plaintiff came in, Ms. Garza mentioned to Chuck Akers, a manager involved in the Workforce training programs and Director of Commercial Operations at Goodwill, that they had another person interested in the Junior Editor job. She told Mr. Akers that someone named "Sheree Shepherd" had come in to fill out an application and that she "seemed to have worked at CCAD before." (Id. at 3.) Mr. Akers did not recognize the name, so he called Ms. Johnson, Plaintiff's former supervisor at STLB, now a Project Manager for Goodwill, and asked if Plaintiff had previously worked at CCAD. (D.E. 18, Ex. 4 (Akers statement) at 1.) Ms. Johnson told Mr. Akers that Plaintiff had worked for the STLB at the

Naval Base and that she had problems with the military police there, resulting in her base security pass being taken away, her decals stripped from her vehicle, and Plaintiff being escorted off the base. (Id.; D.E. 18, Ex. 8 (Johnson statement) at 1-2.)

Based on what Ms. Johnson told him about Plaintiff's prior employment at the base, Mr. Akers told Ms. Garza that Goodwill would not interview Ms. Shepherd. He believed that, given the strict security, "there was no way she would be accepted for an employee position at the Base." (D.E. 18, Ex. 4 (Akers statement) at 1.) Ultimately, Mr. Akers decided to hire other disabled individuals for the position. (D.E. 18, Ex. 11 (Garza statement) at 2.) According to Ms. Johnson, Goodwill hired a disabled individual named Randy Cashman during the week of August 6, 2007. (D.E. 18, Ex. 8 (Johnson statement) at 1.)

Plaintiff contends that after applying for the Junior Editor position with Goodwill, she inquired several times about the status of her application but was given no response. (D.E. 19, Ex. 1 (Shepherd Affidavit) at 7.)[2] Plaintiff claims that, at some point after applying, she learned that the supervisors to whom her application was or would be submitted were the aforementioned Ms. Johnson and Ms. Benavidez from her former job at STLB. Plaintiff came to believe that Goodwill decided not to offer her the position of Junior Editor because of the previous allegations Plaintiff had made against STLB, Ms. Johnson, and Ms. Benavidez. That is, Goodwill's hiring decision was the result of unlawful retaliation for Plaintiff's decision to file a charge of discrimination against her former supervisors at STLB. (D.E. 1 at 4; D.E. 19, Ex. 1 (Shepherd Affidavit) at 7.)

---

[2] Defendant denies that these inquiries ever took place. Mr. Akers states that he did not hear anything about Ms. Shepherd after his phone conversation until March 2008. (D.E. 18, Ex. 4 at 1.) Ms. Garza concedes that she had one further encounter with Plaintiff, who appeared in the Goodwill reception area again a week or two later. At Plaintiff's request, she made Plaintiff some copies of some Goodwill job listings. However, she does not recall Plaintiff inquiring about the Junior Editor position. (D.E. 18, Ex. 2 (Garza statement) at 3.) She does "not ever recall discussing the junior editor position with [Plaintiff] after the first day [Ms. Garza] met her." (Id. at 3.)

Consequently, on March 6, 2008, Plaintiff timely filed a charge of discrimination against Goodwill with the City of Corpus Christi Human Relations Commission, alleging discrimination on the basis of race and disability as well as retaliation. (D.E. 1 at 4; D.E. 19, Ex. D.)

On January 25, 2010, the City of Corpus Christi Human Relations Commission issued a "Mixed Determination," with a "reasonable cause" finding on Plaintiff's claim for retaliation and a "no cause" finding on Plaintiff's claim for discrimination based on race and/or disability. (D.E. 19, Ex. E at 21.)[3] On July 1, 2010, the EEOC issued a determination that it was unable to conclude based on the record whether Defendant had violated Title VII or the ADA, and sent Plaintiff a dismissal and notice of rights. (D.E. 18, Ex. 6.)

On September 28, 2010, Plaintiff timely filed a complaint with this Court alleging that Defendant discriminated and retaliated against her in violation of the ADA and Title VII. (D.E. 1.)

Defendant has moved for summary judgment on all of Plaintiff's claims. (D.E. 18.) Plaintiff has timely responded. (D.E. 19.)

### III. Discussion

#### A. Discrimination Under Title VII and the ADA

Title VII makes it unlawful for an employee to "discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). The ADA prohibits a covered entity from discriminating "against a qualified individual on the basis of disability in regard to job application procedures,

---

[3] Defendant contends, without elaborating, that the Corpus Christi Human Relations Commission merely issued a recommendation, and that this recommendation was rejected by the EEOC "due to the improper conduct of the Corpus Christi Investigator." (D.E. 5 at 4, ¶ 15.)

the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

### 1. Prima Facie Case

"In an employment discrimination case, the plaintiff bears the initial burden of first establishing a prima facie case of unlawful discrimination." Sanders v. Anadarko Petroleum Corp., 108 Fed. Appx. 139, 142 (5th Cir. 2004) (citing Reeves v. Sanderson Plumbing Prod., 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).)

Under Title VII, to meet this burden, Plaintiff must prove: (1) she is a member of a protected class, (2) she was qualified to do the job, (3) she suffered an adverse employment action, and (4) others outside the protected group (non-Blacks) were treated more favorably than she was. Id. (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).)

"[T]o establish a prima facie case under the ADA [Plaintiff] must show: (1) that [she] has a disability; (2) that [she] was qualified for the job; and (3) that [she] was subject to an adverse employment decision because of [her] disability." Rizzo v. Children's World Learning Ctr., 84 F.3d 758, 763 (5th Cir. 1996) (quoting Ivy v. Jones, 192 F.3d 514, 516 (5th Cir.1999)) (emphases removed); see also Kemp v. Holder, 610 F.3d 231, 235 (5th Cir. 2010).

#### a. Member of Protected Class

It is not in dispute that Plaintiff is Black and is certified as a blind individual. Therefore, she qualifies as belonging to a protected class under both Title VII and the ADA.

#### b. Qualified for the Job

Defendant contends that Plaintiff cannot make out a prima facie showing under the ADA that she was "qualified" to perform the job of Junior Editor for the Goodwill. (D.E. 18 at 7.)

Under the ADA, a "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12112(a); § 12111(8); Daugherty v. City of El Paso, 56 F.3d 695, 696 (5th Cir. 1995), cert. denied, 116 S. Ct. 1263, 134 L. Ed. 2d 211 (1996).

The Court finds Plaintiff has raised a genuine issue of material fact as to whether she was qualified for the position of Junior Editor at the Goodwill. As explained, the Junior Editor position required the individual to have a disability. (D.E. 18, Ex. 7 (job posting) at 1.) Because she is blind, Plaintiff satisfied this requirement.

The job also required a minimum of one year of job experience in editorial work/creative writing or an Associate's degree in English, and two years of relevant computer experience using Microsoft Office Suite. The position also required that the applicant have "proficient typing skills." (Id.)

Plaintiff did not have an Associate's degree. (D.E. 18, Ex. 3 (Plaintiff's application) at 3). However, she had prior experience in writing and editing. Her main relevant experience came from her time as a Junior Editor for the STLB in early 2006. (Id. at 2.) As explained above, Plaintiff's job at STLB had lasted less than a month; and, according to Ms. Johnson, Plaintiff "never completed a single page of editing" during her time there. (D.E. 18, Ex. 8 (Johnson statement) at 3.) However, Plaintiff asserts that during the short time she worked for STLB she wrote and edited military documents such as Standard Operating Procedures (SOPs) and Questionnaires for Public Trust Positions for security clearance. (D.E. 19, Ex. 1 (Shepherd Affidavit) at 5.) She states that she "did well and was praised by her supervisors for the good work that [she] did there." (Id.) She has provided copies of emails she received, including one

email apparently from Ms. Johnson, praising her performance on a job for the Security Department, stating: "Sheree, you did a GREAT JOB!!" (D.E. 19, Ex. C (Email dated February 15, 2006).) Especially given that Ms. Johnson and Plaintiff disagree over the circumstances of Plaintiff's firing from the STLB, the Court finds an issue of fact remains as to whether Plaintiff was doing a "great job" in her position as Junior Editor at STLB and as to whether this provided her with the relevant experience necessary to perform the same job at the Goodwill.

As said, the job also required that the applicant have two years' experience using Microsoft Office Suite (Word and Excel) and "proficient typing skills." (D.E. 18, Ex. 7 (job posting) at 1.) Plaintiff did not list any relevant computer skills on her job application, leaving blank the line for "Computer Skills/Business Machines" as well as the line for "Other certifications, professional designations, skills and training which qualify you for this position[.]" (D.E. 18, Ex. 3 at 1.) However, in her Affidavit Plaintiff attests that throughout her work history she has become proficient with computers and with a myriad of computer software programs, including Microsoft Word, Word Perfect, Microsoft Windows and Outlook, as well as with graphic design. (D.E. 19, Ex. 1 (Shepherd Affidavit) at 3.) Plaintiff's prior employment history supports this assertion. From 1999 to 2000, she worked to create a small publication for which she wrote articles and notices and did graphic designs. (D.E. 19, Ex. 1 (Shepherd Affidavit) at 3.)

Defendant also contends Plaintiff was too slow when it came to editing and that this made her unqualified for the Junior Editor position. According to Ms. Garza, who administered the editing test, Plaintiff took a very long time to complete it, taking about one hour and forty-five minutes, compared with other applicants who took only an hour. (D.E. 18, Ex. 2 at 2.) However, regardless of whether Plaintiff's time was comparatively slow or not, the record

indicates that she may not have been working with a "reasonable accommodation" when she took the test. § 12112(a); § 12111(8). Plaintiff contends she was not provided with "JAWS" or any special zooming program for people with visual impairments. Nor was the computer enhanced to her satisfaction using the Microsoft default text enlarger. (D.E. 18, Ex. 10 (Shepherd Depo.) at 228-229, 231). Plaintiff admits that she did not complain at the time that she was not satisfied with the adjustment provided, but states that she believed that in order to take the test she "had to utilize what was given to [her]." (D.E. 18, Ex. 10 at 11) (Q: Did you indicate to [the IT person] that you were not satisfied? A: I told him — no, I did not say I wasn't satis — it's the point is this is what we can provide for you and in order for me to test, I had to utilize what was given to me.) Accordingly, an issue of fact remains as to whether Plaintiff had the editing skills to perform the job of Junior Editor at the Goodwill, with or without reasonable accommodation. § 12112(a); § 12111(8).

Plaintiff has succeeded in raising a genuine issue of material fact as to whether she was qualified to perform the job of Junior Editor for Goodwill. § 12112(a); § 12111(8).

### c. Adverse Employment Decision

It is not in dispute that Plaintiff was not hired for the position of Junior Editor: Goodwill never contacted her for an interview. (D.E. 18 at 4.) Thus, under Title VII, she has shown that she was subject to an adverse employment decision and that someone outside the protected class was treated more favorably by being hired in her stead. Sanders, 108 Fed. Appx. at 142. Although the person who was ultimately hired was also disabled, by all accounts he was not Black. (D.E. 18, Ex. 8 (Johnson statement) at 1) (describing the hired employee Randy Cashman as disabled, though not mentioning his race).

Under the ADA, as well, Plaintiff has shown an "adverse employment decision" occurred and has raised an issue of fact as to whether it was "because of" her disability. Rizzo, 84 F.3d at 763. Defendant contends the decision not to hire Plaintiff could not have been "because of" her disability as the Goodwill was contractually obligated to and did hire another individual with a disability. However, according to Plaintiff, Goodwill did not hire a *visually impaired* person for the job. (D.E. 19 at 4, 16.) Thus, Goodwill's decision was, potentially, "because of" Plaintiff's particular disability. Id. Moreover, the Fifth Circuit has held that the ADA's use of the causal language "because of" does not mean that discriminatory conduct is prescribed only if it was solely because an employee was disabled; rather, "[t]he proper causation standard under the ADA is a 'motivating factor' test." Pinkerton v. Spellings, 529 F.3d 513, 519 (5th Cir. 2008). "Under the ADA, 'discrimination need not be the sole reason for the adverse employment decision, [but] must actually play a role in the employer's decision making process and have a determinative influence on the outcome.'" Id. (quoting Soledad v. United States Department of Treasury, 304 F.3d 500, 503-504 (5th Cir. 2002)).

Plaintiff has met her burden on summary judgment to establish a prima facie case for discrimination on the basis of both her race and her disability. Sanders, 108 Fed. Appx. at 142; Rizzo, 84 F.3d at 763.

### 2. Legitimate Nondiscriminatory Reasons

If a plaintiff makes a prima facie showing of discrimination, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its employment action. See Russell v. McKinney Hosp. Venture, 235 F.3d 219, 222 (5th Cir. 2000). The employer's burden is only one of production, not persuasion, and involves no credibility assessment. Id.

Under this standard, requiring no assessment of credibility, Defendant has met its burden to produce a legitimate nondiscriminatory reason for not hiring Shepherd. Id. Defendant provides the following legitimate nondiscriminatory reasons for not hiring Plaintiff: she was slow in completing her skills assessment test and would not have had security clearance to enter the military base and its computer system. (D.E.

### 3. Pretext

"[I]f the employer carries its burden [to provide legitimate non-discriminatory reasons for its decision], the 'mandatory inference of discrimination' created by the plaintiff's prima facie case, 'drops out of the picture' and the fact finder must 'decide the ultimate question: whether [the] plaintiff has proven [intentional discrimination.]'" Russell, 235 F.3d at 222 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511-12, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).) "[T]he burden shifts back to the plaintiff to establish either: (1) that the employer's proffered reason is not true but is instead a pretext for discrimination; or (2) that the employer's reason, while true, is not the only reason for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic." Alvarado v. Texas Rangers, 492 F.3d 605, 611 (5th Cir. 2007) (citing Rachid v. Jack in the Box, Inc., 376 F.3d 305, 312 (5th Cir.2004)).

#### a. Pretext for Discrimination on the Basis of Disability

As said, Defendant provides the following legitimate nondiscriminatory reasons for not hiring Plaintiff: (1) she was slow in completing her skills assessment test, and (2) would not have had security clearance to enter the military base and its computer system.

As to the first proffered reason, the Court finds there remains a triable issue of fact as to the truth of Defendant's assertion that the decision not to hire Plaintiff was due to her lacking editing and computer skills. (D.E. 18 at 11.) As discussed above, the record shows that Plaintiff

was able to perform the editing exercise and that, although she took longer than most applicants, she was not provided with appropriate software for the visually impaired. In addition, while she was employed at STLB in exactly the same editing job, Plaintiff received emails from her supervisors praising her job performance. (D.E. 19, Ex. C (Email dated February 15, 2006).)

Defendant next contends that it chose not to hire Plaintiff because she might not have the proper security clearance to enter the Navy Base and computer system due to her prior altercation with the military police at the STLB, when her security pass was taken away and she was escorted off the base. (D.E. 18 at 11.) According to Mr. Akers, this was primary reason he chose not to select Plaintiff for an interview. (D.E. 18, Ex. 4 (Akers statement) at 1.) Ms. Johnson confirms that the military police are very strict and that she and Mr. Akers had "worked extensively with getting [Goodwill] employees through the security clearance process[.]" (D.E. 18, Ex. 8 (Johnson statement) at 2.) Plaintiff herself appeared unsure as to whether she would be allowed back on the base following this incident, allegedly stating to Ms. Garza during their first meeting that she probably would not be hired again "out there." (D.E. 18, Ex. 2 (Garza statement) at 1.)

It is certainly possible that, because Plaintiff's security clearance had previously been revoked, she would not have been able to enter the base again. However, given the discrepancy between Plaintiff's and Ms. Johnson's account of the events leading to her ouster from the military base in February 2006, the Court finds there is a genuine issue of material fact as to whether Plaintiff would have been permitted to enter the base again to perform her new job with STLB. Indeed, in her Affidavit Plaintiff asserts that, once she spoke with the military police and explained the situation, they "realized they had made a mistake and told [her] that [she] could get [her] clearance or security stickers reissued." (D.E. 19, Ex.1 at 5.) Moreover, even if the issue

of security clearance was one factor behind Mr. Aker's decision, it may not have been the only factor. Alvarado, 492 F.3d at 611. Taken as a whole, the evidence is sufficient to cast doubt on Defendant's contention that the decision not to hire Plaintiff as Junior Editor had "nothing to do" with her impaired sight. Id.

### b. Pretext for Discrimination on the Basis of Race

Plaintiff has also met her burden under Title VII to raise an issue of fact as to whether Defendant's proffered reasons are merely pretext for discrimination on the basis of race. Defendant contends it is impossible that Mr. Akers made his decision not to interview Plaintiff on the basis of Plaintiff's race because he had never met Plaintiff and did not know her race when he decided not to invite her for an interview. (D.E. 18 at 10.) However, Ms. Johnson — who had worked with Plaintiff at STLB and who spoke with Mr. Akers regarding Plaintiff before he made his decision — did know Plaintiff's race. Based on the evidence, the Court finds it is possible that Mr. Akers acted as the "cat's paw" of Ms. Johnson and that Ms. Johnson exhibited racial animus towards Shepherd. Hervey v. Mississippi Dept. of Educ., 404 Fed.Appx. 865, 871 (5th Cir. 2010) (unpublished).

"'To invoke the cat's paw analysis, [the employee] must submit evidence sufficient to establish two conditions: (1) that a co-worker exhibited [racial] animus, and (2) that the same co-worker possessed leverage, or exerted influence, over the titular decision-maker.'" Id. (quoting Roberson v. Alltel Info. Servs., 373 F.3d 647, 653 (5th Cir.2004)).

Plaintiff has provided some evidence of racial animus on the part of Ms. Johnson. She states that, when she was escorted off the military base just before being terminated from her position with STLB, the military police ordered her to put up her hands and told her that Ms. Johnson had reported that she had "made a terrorist threat." (D.E. 19, Ex. 1 (Shepherd Affidavit)

at 4.) Notably, Ms. Johnson did not mention any "terrorist threat" in her own statement regarding the incident. Instead, she claims that she had "called for medical assistance" because she was "concerned for [Plaintiff's safety.]" (D.E. 18, Ex. 8 (Johnson statement) at 2.) Whether or not Ms. Johnson did accuse Plaintiff of making a "terrorist threat" and whether or not this accusation is evidence of racial animus on the part of Ms. Johnson depends on the context and the specific factual circumstances, and is a question of fact for a jury. See Reeves, 530 U.S. at 143.

As explained further below, there is also an issue of fact as to whether and to what degree Ms. Johnson exercised leverage or exerted influence over Mr. Akers in making the hiring decision. Hervey, 404 Fed.Appx. at 871. Defendant's motion for summary judgment with respect to Plaintiff's claim for discriminatory failure to hire on the basis of disability and/or race is therefore denied. Douglas, 411 U.S. at 802; Rizzo, 84 F.3d at 763.

### B. Retaliation Claims

Plaintiff also alleges that, in declining to select her for an interview, Goodwill acted in retaliation for Plaintiff's prior filing of a charge with the EEOC against her supervisors at the STLB. Plaintiff's theory is that her supervisors at STLB, Ms. Johnson and Ms. Benavidez, knew Plaintiff had filed a charge of discrimination against them and chose to retaliate against her by telling Mr. Akers not to hire her. (D.E. 1 at 4.)

With respect to Ms. Benavides, the Court finds on summary judgment that Plaintiff fails to make a prima facie case against the Goodwill because Ms. Benavides was not and never has been an employee of the Goodwill, and the record does not show she played any role in Goodwill's hiring decision. (D.E. 18, Ex. 11 (Garza statement) at 1.) With respect to Ms.

Johnson, however, Plaintiff has succeeded in making out a prima facie case for retaliation under Title VII and the ADA.

The anti-retaliation provision of Title VII, 42 U.S.C. § 2000e-3(a), provides, in relevant part, that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees …because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." § 2000e-3(a).

The anti-retaliation provision of the ADA, 42 U.S.C. § 12203, provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this chapter." § 12203.

### 1. Prima Facie Case for Retaliation

To establish a prima facie case of retaliation, Plaintiff must show that (1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) a causal link existed between the protected activity and the adverse action. Gee v. Principi, 289 F.3d 342, 345 (5th Cir. 2002); Seaman v. CSPH, Inc., 179 F.3d 297, 301 (5th Cir.1999) (reciting same elements for ADA).

The parties do not disagree that Plaintiff has satisfied the first two elements of her prima facie case: she engaged in protected activity by filing a charge of discrimination against her supervisors at STLB and suffered an adverse employment action when she was subsequently not hired by the Goodwill. The Court must determine, however, whether Plaintiff is able to raise a

fact issue regarding a causal connection between her charge of discrimination and her non-selection for the Junior Editor position with Goodwill.

The causal link required by the third prong of the prima facie case for retaliation does not rise to the level of a "but for" standard. Raggs v. Miss. Power & Light Co., 278 F.3d 463, 471 (5th Cir.2002). The plaintiff "need not prove that her protected activity was the sole factor motivating the employer's challenged decision in order to establish the 'causal link' element of a prima facie case." Long v. Eastfield Coll., 88 F.3d 300, 305 n. 4 (5th Cir.1996) (citation omitted).

Defendant argues Plaintiff cannot satisfy the element of causation because it was Mr. Akers, as director of commercial operations for Goodwill, who made the decision not to hire Plaintiff, not Ms. Johnson. Thus, claims Defendant, Goodwill's motive in choosing not to hire Plaintiff could not have been retaliatory. (D.E. 18 at 15.) The Court disagrees, however, finding that Ms. Johnson's involvement in the hiring decision is sufficient to raise a fact issue as to motive and causation on the part of Mr. Akers and Goodwill.

It is ordinarily the law in the Fifth Circuit that "in determining whether an adverse employment action was taken as a result of retaliation, our focus is on the final decisionmaker." Gee, 289 F.3d at 346 (citing Long, 88 F.3d at 306-307.) "The statements and actions of ordinary employees are normally not imputable to the employer." Id. (citing Long, 88 F.3d at 306; Price Waterhouse v. Hopkins, 490 U.S. 228, 277, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring in the judgment) ("[S]tatements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself [do not] suffice to satisfy the plaintiff's burden....").)

"Nevertheless, when the person conducting the final review serves as the 'cat's paw' of those who were acting from retaliatory motives, the causal link between the protected activity and adverse employment action remains intact." Id. (citing Long, 88 F.3d at 307 (quoting Shager v. Upjohn Co., 913 F.2d 398, 405 (7th Cir. 1990)).). "The ultimate question, therefore, is whether ' 'the employee can demonstrate that others had influence or leverage over the official decisionmaker.'" Id. (quoting Rios v. Rossotti, 252 F.3d 375, 382 (5th Cir. 2001) (quoting Russell v. McKinney Hosp. Venture, 235 F.3d 219, 226 (5th Cir. 2001)).) "As Long instructs, '[t]he degree to which [the final decisionmaker's] decisions were based on his own independent investigation is a question of fact....'" Id. (quoting 88 F.3d at 307.)

Based on these principles, Plaintiff has succeeded in raising a fact issue as to whether Ms. Johnson's opinions influenced Mr. Aker's decision not to hire Plaintiff, such that Mr. Akers served as the "cat's paw" of Ms. Johnson. Gee, 289 F.3d at 346. Ms. Johnson, who was a Project Manager at the Goodwill when Goodwill was hiring its Junior Editors, concedes that "she was involved in the selection process." (D.E. 18, Ex. 8 (Johnson statement) at 1.) She states that Mr. Akers, who "made the hiring decisions," called her during the week of August 13, 2007 to see if she knew Plaintiff. Ms. Johnson told Mr. Akers that she remembered Ms. Shepherd and told him how Ms. Shepherd had been removed from the base and had her base access taken away. (Id.)

Ms. Johnson contends that Mr. Akers did not ask for her opinion before he made the decision not to interview Plaintiff and that she did not give her opinion. (Id. at 2.) Nevertheless, "'[t]he degree to which [Mr. Aker's] decisions were based on his own independent investigation," rather than upon the influence or leverage of Ms. Johnson, "is a question of fact....'" See Long, 88 F.3d at 307; Gee, 289 F.3d at 346 (reversing district court's conclusion

that plaintiff had not created a triable fact issue regarding whether final decision maker was influenced by employee who stated at meeting that plaintiff had a problem communicating and getting along with others).

There is also some evidence that Ms. Johnson knew Plaintiff had filed a complaint against STLB and that Ms. Johnson may have acted from retaliatory motives in advising Mr. Akers. Although Defendant states that "Ms. Johnson never knew that Plaintiff had made a complaint against South Texas Lighthouse for the Blind," (D.E. 18 at 15), Ms. Johnson's own statement does not confirm this assertion. Ms. Johnson does not state that she "never knew that Plaintiff had made a complaint" against STLB. In fact, Ms. Johnson relates that, during the short time Ms. Shepherd worked for STLB, "[s]he openly talked to [Ms. Johnson] and other employees about her lawsuits that she had been involved in, and made it known that she had an attorney." (D.E. 18, Ex. 8 (Johnson statement) at 3.) Based on this statement, it is possible that, following Ms. Shepherd's departure from STLB, Ms. Johnson became aware of the charge of discrimination filed with the EEOC against STLB, referencing Ms. Johnson and Ms. Benavidez, and that she acted out of retaliatory motives in advising Mr. Akers regarding Plaintiff's job history.

Accordingly, the Court finds Plaintiff has made out a prima facie case for retaliation under Title VII and the ADA. Gee, 289 F.3d at 346.

### 2. Legitimate Non-Retaliatory Reasons for Not Hiring Plaintiff

"Assuming the plaintiff is able to establish [her] prima facie case, the burden then shifts to the defendant to demonstrate a legitimate nondiscriminatory purpose for the employment action." Aldrup v. Caldera, 274 F.3d 282, 286 (5th Cir.2001). Here, Defendant has succeeded in presenting the Court with a legitimate non-retaliatory purpose for not hiring Plaintiff, contending

that Goodwill's decision not to interview her was based on the report Mr. Akers received from Ms. Johnson, which led him to believe in good faith that Plaintiff could not obtain the necessary security clearance to get onto the jobsite and the military's computer system. (D.E. 18 at 17.)

### 3. Pretext for Retaliatory Motive

As Defendant has met its burden of production to provide a legitimate non-retaliatory reason for not selecting Plaintiff, the burden is on Plaintiff to prove that Goodwill's stated reason was merely a pretext for the real, retaliatory purpose. Gee, 289 F.3d at 345. As explained, it is not clear on summary judgment that Plaintiff would not have been able to revive her security clearance to enter the Base, casting doubt on Defendant's assertion that this is the primary reason she was not selected for an interview. In addition, as discussed above, Plaintiff has succeeded in raising a triable issue of fact as to whether Ms. Johnson knew that Plaintiff had filed a charge of discrimination with the EEOC based on her termination from STLB and acted with retaliatory motives to influence Mr. Aker's employment decision. Long, 88 F.3d at 307; Gee, 289 F.3d at 346. Defendant's motion for summary judgment is denied with respect to Plaintiff's retaliation claim. At trial, Plaintiff retains the burden to prove that Ms. Johnson acted from retaliatory motives and that she influenced Mr. Aker's decision. Gee, 289 F.3d at 345.

## IV. Conclusion

For the reasons stated above, Defendant Goodwill Industries of South Texas Inc.'s Motion for Summary Judgment is DENIED. (D.E. 18.)

SIGNED and ORDERED this 25th day of July, 2011.

_____
Janis Graham Jack
Senior United States District Judge